UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| JANET LEIGH RUTHERFORD, ) | |
| ) | |
| Plaintiff, ) | No. 6:23-CV-161-HAI |
| ) | |
| v. ) | |
| ) | MEMORANDUM OPINION |
| MARTIN O'MALLEY, *Commissioner of* ) | & ORDER |
| *Social Security*, ) | |
| ) | |
| Defendant. ) | |
| ) | |

*** *** *** ***

In October 2020, Janet Leigh Rutherford (also known as Janet Leigh Day or Janet Leigh Walker) filed Title II and XVI applications for disability benefits and supplemental security income. *See* D.E. 5-5 at 322.[1] She alleged disability beginning September, 2019, but that was later amended to December 3, 2019. The Social Security Administration denied her claims initially and upon reconsideration. Then, on June 28, 2022, Administrative Law Judge ("ALJ") Davida Isaacs conducted a telephonic administrative hearing. The ALJ heard testimony from Rutherford (represented by attorney D. Daniel Bott) and impartial vocational expert ("VE") Mary Skinner. *Id*. Rutherford was found to not be disabled during the relevant period, December 3, 2019, to September 2, 2022, the date of the decision. *Id*. at 37. Rutherford obtained a previous unfavorable ALJ decision on December 2, 2019 (D.E. 5-3 at 95), but the latter ALJ found that the record contained new and material evidence that warranted altering the prior severity, residual functional capacity, and past relevant work findings.

---

[1] References to the administrative record are to the large black page numbers at the bottom of each page. The administrative transcript here is large and was filed in ten parts.

1

Rutherford brought this action under 42 U.S.C. §§ 405(g) and 1383(c) on August 28, 2023, to obtain judicial review.  D.E. 1.  The parties consented to the referral of this matter to a magistrate judge.  D.E. 10.  Accordingly, this matter was referred to the undersigned to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  After the record was filed (D.E. 5), the parties submitted briefs (D.E. 9, 13, 14).  The Court, having reviewed the record and for the reasons stated herein, **DENIES** Jones's request for relief.

## I. The ALJ's Decision

Under 20 C.F.R. §§ 404.1520, 416.920, an ALJ conducts a five-step analysis to evaluate a disability claim.  The ALJ followed these procedures in this case.  *See* D.E. 5-2 at 18-20.

At the first step, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  In this case, the ALJ found that Rutherford "has not engaged in substantial gainful activity since December 3, 2029, the amended alleged date."  D.E. 5-2 at 20.

At the second step, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  The ALJ found that Rutherford has the following severe impairments: "degenerative disc disease of the lumbar spine, chronic obstructive pulmonary disease (COPD), pulmonary hypertension, Alpha 1 antitrypsin deficiency, hepatic cirrhosis, and moderate anterior anterolateral ischemia (20 CFR 404.1520(c) and 416.920(c))."  D.E. 5-2 at 21.  Rutherford does not argue the ALJ should have identified additional severe impairments.

At the third step, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, then she is disabled. 20 C.F.R. § 404.1520(d). The ALJ found Rutherford failed to meet this standard. D.E. 5-2 at 23-24. The ALJ considered several listings but found none of them satisfied in Rutherford's case. *Id*. Concerning her back issues, the ALJ considered Section 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root) and Section 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina). The ALJ found no evidence Rutherford "cannot perform fine and gross movements with at least one upper extremity due to a combination of extremity-related limitations and the use of a medically necessary mobility device." The ALJ also considered Section 3.02 (chronic respiratory disorders) and found her severe impairments were not so severe as to meet or equal this listing. *Id*. Rutherford does not appear to challenge this step-three determination. Her briefing nowhere addresses the elements of these or any other listed impairments.

If, as here, a claimant is found non-disabled at step three, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"), which is her ability to do physical and mental work activities on a sustained basis despite limitations from the impairments. The ALJ found Rutherford had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except that she must avoid more than occasional exposure to temperature extremes, humidity, wetness, pulmonary irritants, and vibration. She must avoid all exposure to hazards such as unprotected heights or around hazards such as heavy equipment." D.E. 5-2 at 24.

Rutherford objects the ALJ's RFC finding. Her specific argument is that her need for a weekly infusion renders her "incapable of performing full-time competitive employment." D.E. 9 at 6.

3

At the fourth step, if a claimant's impairments do not prevent her from doing past relevant work (given the ALJ's assessment of her residual functional capacity), she is not disabled. 20 C.F.R. § 404.1520(f). The ALJ found that Rutherford's claim failed at this step. The ALJ found that Rutherford had past relevant work as a receptionist at an animal clinic in 2008, and that, given her RFC, she would be able to perform this work again. D.E. 5-2 at 30.

At the fifth step, if a claimant's impairments (considering his RFC, age, education, and past work) do not prevent her from doing other work that exists in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g). The ALJ, in the alternative, found Rutherford was not disabled at this step. D.E. 5-2 at 30-31. In addition to Rutherford's past relevant receptionist work, the ALJ opined that other jobs existed in significant numbers in the national economy that she could perform at her RFC.[2] *Id*.

Accordingly, on September 2, 2022, the ALJ issued an unfavorable decision, finding that Rutherford was not disabled. D.E. 5-2 at 33. The Appeals Council declined to review the ALJ's decision on July 5, 2023. *Id*. at 1.

The burden of proof is relevant to this case:

> Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work, but at step five of the inquiry . . . the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile.

*Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

---

[2] The ALJ's basis for this alternative finding is unclear. At the hearing, the ALJ asked the vocational expert about light exertional jobs, but not sedentary jobs. The only exception was that the vocational expert specified that the receptionist job was classified as sedentary. *See* D.E. 5-2 at 82. This is different from a typical case, where the ALJ asks the vocational expert to identify jobs with the same RFC as the RFC in the ALJ's ultimate decision.

## II.  Framework for Judicial Review

Under the Social Security Act, a "disability" is defined as "the inability to engage in 'substantial gainful activity' because of a medically determinable physical or mental impairment of at least one year's expected duration." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007).  Judicial review of the denial of a claim for Social Security benefits is limited to determining whether the ALJ's findings are supported by substantial evidence and whether the correct legal standards were applied. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the court." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*) (quotes and citations omitted).

In determining the existence of substantial evidence, courts must examine the record as a whole. *Mullen*, 800 F.2d at 545 (citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983)).  However, courts are not to conduct a *de novo* review, resolve conflicts in evidence, or make credibility determinations.  *Id.* (citations omitted); *see also Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1228 (6th Cir. 1988).  Rather, if the ALJ's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999); *see also Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Mullen*, 800 F.2d at 545; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

Under the current rules, all medical opinions are weighed in light of several factors: supportability, consistency, relationship with the claimant, specialization, and any other relevant factors. 20 C.F.R. § 416.920c(c). Supportability and consistency "are the most important factors" in weighing medical opinions. *Id*. § 416.920c(b)(2).

Disability determinations often hinge on the claimant's credibility. The ALJ must consider statements or reports from the claimant. 20 C.F.R. § 404.1529(a). To determine whether statements of a claimant are credible, the following two-part test is used:

> First, the ALJ will ask whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).[3] It is within the province of the ALJ, rather than the reviewing court, to evaluate the claimant's credibility. *Rogers*, 486 F.3d at 247 (citing *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *Crum v. Sullivan*, 921 F.2d 644 (6th Cir. 1990); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981)). Even so, the credibility determinations of the ALJ must be reasonable and supported by substantial evidence. *Rogers*, 486 F.3d at 249.

---

[3] In 20 C.F.R. § 404.1529, the Social Security Administration informs claimants that, in certain credibility determinations, the following factors should guide the analysis of the agency decision makers:

> (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1037-38 (6th Cir. 1994).

Finally, issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. *United States v. Kerns*, 9 F.4th 342, 351 (6th Cir. 2021); *Strickland v. City of Detroit*, 995 F.3d 495, 511 (6th Cir. 2021).

### III. Analysis

Rutherford's appeal is premised solely on her weekly infusion requirement. One of Rutherford's severe impairments (D.E. 5-2 at 21) is Alpha 1 antitrypsin deficiency. Her body lacks a protein, AAT, and this renders her lungs more easily damaged and susceptible to lung disease. D.E. 9 at 6. Rutherford points out that, under SSA regulations, full-time competitive employment requires the ability to work eight hours a day, five days a week, or an equivalent work schedule. *Id*. She says that she cannot do this due to her weekly infusion for her Alpha 1 antitrypsin deficiency and its side-effects. *Id*. Each week, a nurse comes to her home, the infusion takes an hour, and Rutherford must remain still for an additional half hour. *Id*. Rutherford says these infusions cause nausea, and the effects require that she "rest for the remainder of the day and often through the weekend." *Id*. at 7. She argues that obviously she could not do full time employment because of her "recurring weekly absence." *Id*. She says the ALJ "failed to account for [her] medically required weekly treatments" and "the RFC fails to include any accounting of routine absences or time off-task." *Id*. at 8.

The RFC determination is the ALJ's ultimate determination of what a claimant can still do despite her physical or mental limitations. 20 C.F.R. §§ 404.1545(a), 404.1546(c), 416.945(a), 416.946(c). The ALJ makes this finding based on a consideration of medical source statements and all other evidence in the case record. 20 C.F.R. §§ 404.1529, 404.1545(a)(3), 404.1546(c), 416.929, 416.945(a)(3), 416.946(c). Thus, in making the RFC determination, the ALJ must evaluate the persuasiveness of the medical source statements in the record and assess

the claimant's subjective allegations. 20 C.F.R. §§ 404.1520c, 404.1529(a), 416.920c, 416.929(a).

Social Security Rule 96-8P requires the ALJ to consider "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996). A claimant is disabled under the Social Security regulations if her impairment would cause excessive absenteeism from work. *See Jones v. Sec. Health & Human Serv.,* No. 84-5376, 1985 WL 12990, at *3 (6th Cir. Feb. 8, 1985) (remanding the case to the ALJ to adduce vocational expert testimony as to whether there are jobs available where an employer would tolerate frequent absenteeism).

One aspect of Rutherford's argument is that she faults the ALJ for inappropriately questioning her credibility concerning the infusions and their side effects. *Id*. The ALJ's opinion includes the standard credibility-questioning language:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record.

D.E. 5-2 at 25.

In assessing a claimant's subjective allegations, Administrative Law Judges apply the two-part test set forth in *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). First, the ALJ must examine whether there is objective medical evidence of an underlying medical condition. If there is, then the ALJ must determine: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2)

8

whether the objectively established medical condition is of such severity that it can reasonably be expected to produce the alleged disabling pain." *Id*. When the reported pain and other symptoms suggest an impairment or impairments of greater severity than can be shown by objective medical evidence, the ALJ should consider other information and factors such as daily activities, frequency of treatment, inconsistencies in the evidence, and medication prescribed which may be relevant to the degree of pain alleged. 20 C.F.R. §§ 404.1529(c)(3) and (4), 416.929(c)(3) and (4).

To be clear, this is not a case where the ALJ allegedly completely ignored, disregarded, or omitted any reference to the medical issue raised on appeal. The ALJ's opinion does note Rutherford's weekly infusion treatments in several places. In the discussion following the statement of the RFC, the ALJ observes the following:

> She also reported that she has weekly Alpha 1 infusions that would make her miss work. The claimant noted that the infusions take 30-40 minutes and that she is usually at the appointment for 1-1.5 hours.

D.E. 5-2 at 25.

> The claimant is additionally diagnosed with Alpha 1 antitrypsin deficiency. Records indicate that the claimant attends weekly lung infusions due to Alpha-1 deficiency with reports that she did well on her treatment regimen (Exhibit B8F/8[4]). At the consultative examination the claimant noted that she received the infusions via a port in the upper right chest wall and that **without the infusions she experienced nausea and vomiting** (Exhibit B13F/5[5]). The record indicates that she was generally compliant for Prolastin infusion therapy, but at least once went a whole month without taking any infusions, even though she had

---

[4] This medical note from December 2020 states that Rutherford reported she is "doing well on her current medications. She is receiving weekly infusions for her alpha 1 antitrypsin deficiency." D.E. 5-7 at 1328. The same note goes on to indicate Rutherford denied nausea and abdominal pain. *Id*. at 1330.

[5] This consultive examination report from May 2021 states says Rutherford "is getting infusions once a week of Prolastin since 2016. She has a port in her right upper chest wall for this infusion. She states that without this treatment, she gets nausea and vomiting." D.E. 5-8 at 1451. This report again notes that "without this treatment, she becomes nauseated with vomiting." *Id*. at 1454.

9

>four available (Exhibit B31F/58, 135, 82[6]).  The record regularly notes that the claimant has experienced **no adverse evidence [sic] or medication complaints** (e.g., Exhibit B31F/123[7]).

*Id*. at 28 (emphasis added).

>Turning to her Alpha 1 antitrypsin deficiency, [treatment] notes indicate that this condition is satisfactorily controlled with infusion therapy (Exhibit B31F).  Notes show **no adverse effects or complications** from this condition.  Though the claimant noted at the hearing that the weekly infusions take 1-1.5 hours to administer, **there is no evidence why the claimant could not receive these treatments outside of work hours**.

*Id*. (emphasis added).

>At the hearing, Rutherford's attorney asked her about her ability to work full-time:
>
>Q:   Could you do what you're doing full-time, if they said, Ms. Rutherford, we actually want you to do this 40 hours a week?  Could you do what you're doing half the time on your feet, standing, walking, half the time sitting down, with no lifting, could you do that full-time, 40 hours a week?
>
>A    No, not at all.  No way.

D.E. 5-2 at 54-55.

>When asked why she could not work full time, Rutherford responded:
>
>A:   Because my feet hurt.  They swell all the time.  I wear slip-on shoes.  And then also my back, I mean, . . . if I sit down too long, it hurts.  If I stand too long, it hurts.  Different reasons like that.  There's no way I could do 40 hours, no way at all.  And then, plus **I couldn't do 40 hours because I have infusions on Friday which make me nauseated and** -- so, I -- I have to rest when I have 'em on Friday.  I -- **I rest through the weekend**, you know.  Not that it puts me down.  I mean, it does, you know, help my Alpha 1.  It's a little rough on me.  You know, that's another reason.

D.E. 5-2 at 55 (emphasis added).

>Rutherford then elaborated on her weekly Alpha 1 lung infusions.  She explained:

---

[6] This note from the nurse providing Prolastin infusions includes that Rutherford "went a whole month without infusions" due to moving.  D.E. 5-10 at 2024.

[7] This is a reference to one of the many progress notes in the record (this one from April 2020) from the nurse administering the Prolastin infusions.

10

> A: It was [intraveinous] through my arm and then I had to end up getting a port because my veins kept growing, so I had a port put in as well.
>
> Q: How long does that process take when you go in for a lung infusion for your Alpha 1 deficiency?

. . . .

> A: [The nurse,] she gets there about noon and after she sets up everything, after she sticks, you know, the -- the port, it probably takes 35, 40 minutes. She's probably there maybe an hour, hour and 15 minutes doing everything.
>
> Q: And once that is completed, how do you feel after the infusion's been completed?
>
> A: A little weak. You're supposed to sit there and rest . . . at least 30 minutes. But up to an hour, you're supposed to rest, not get up and do anything, you know, activity wise. You're supposed to rest. **They give me medication, it's called Zofran, twice a day. You take it every day 'cause it makes you nauseous. That's part of the side effects.** And there's different side effects to it. Things that don't really matter to you all, but [INAUDIBLE] everything. But **nauseating is the biggest thing.**
>
> ALJ: So, ma'am, why don't you schedule those appointments late Friday afternoon? So you could work on Fridays?
>
> A: What I'm doing now, the [work] hours I'm doing now, it's hurting me. You know, it's hard to do that now, what I'm dealing with my feet and my back. I mean, I hurt -- I go home hurting every day. So, what I'm doing, you know, I'm just doing this just -- my sister's paying my mortgage. I'm just doing this to pay my bills.

D.E. 5-2 at 56-57 (emphasis added). This last exchange is significant because the ALJ opinion found "no evidence why the claimant could not receive these treatments outside of work hours." D.E. 5-2 at 28. This exchange did not reveal whether it was technically possible for Rutherford to arrange for infusions outside of normal work hours. The record is silent as to whether the nurse could provide the infusions on Friday evening or perhaps Saturday morning. Instead, when asked, Rutherford balked at the premise that she could do a forty-hour work week at all, given her foot pain and back pain.

11

In addition to the lack of evidence on whether Rutherford could reschedule her infusions to after the work week, the ALJ also appears to have relied on the lack of corroborating evidence that the infusions left Rutherford with lingering weakness and nausea. For example, the ALJ's decision twice points to statements in the record that Rutherford had no adverse effects or complaints associated with the infusion treatments. D.E. 5-2 at 28. And the ALJ highlights one consultive examination stating that *without* the infusion treatments, Rutherford suffers nausea and vomiting. *Id*. (citing D.E. 5-8 at 1451, 1454).

As noted above, Rutherford testified at the hearing that the Prolastin infusions had side effects, the "biggest" of which was nausea, and she took Zofran twice a day to combat the nausea. D.E. 5-2 at 56-57. The Court here takes judicial notice of the publicly available fact that Zofram (Ondansetron) is an antiemetic prescribed mainly to prevent nausea and vomiting associated with surgeries and cancer treatments. Medical records confirm that Rutherford has received a twice-daily prescription for Ondansetron to treat nausea. *See, e.g.*, D.E. 5-8 at 1460, 1468, 1474, 1478, 1482, 1649, 1650; D.E. 5-9 at 1719, 1841, 1856, 1861. The records are replete with references to nausea being an active problem for Rutherford. *See, e.g.*, D.E. 5-8 at 1461, 1469, 1473, 1535, 1539, 1545, 1556. However, the record also contains notes stating Rutherford denies experiencing nausea. *See, e.g.*, *id*. at 1572, 1578. But these denials of nausea could simply indicate the Zofran treatment is effective at times.

Rutherford argues this case is analogous to the 2022 *Cook* case from the Western District. D.E. 9 at 9. In that case, the court held that the ALJ's RFC failed to account for absences necessitated by the claimant's treatment and recovery periods. *Cook v. Kijakazi*, No. 4:20-CV-170-HBB, 2022 WL 854841, at *7 (W.D. Ky. Mar. 22, 2022). The *Cook* claimant "received chemotherapy, infusions, radiation therapy, and attended follow up office visits," and the RFC

12

failed to account for these absences. *Id*. There were also days the claimant had to remain at home, recovering from these treatments. *Id*. The vocational expert in that case had testified that "two days or more of absences each month would preclude all work."[8] *Id*. The botched RFC was thus harmful error warranting reversal. *Id*. at *7-8.

> The Commissioner distinguishes *Cook*:
>
> In *Cook*, the ALJ did not give any indication in the residual functional capacity finding that he considered how many days each month the claimant received chemotherapy, infusions, and radiation therapy and attended follow up appointments related to those treatments. *Cook*, 2022 WL 854841, at *7. But as explained above, the ALJ here clearly considered that Plaintiff received weekly infusions but did not credit her assertion that it would preclude all work since she failed to show that she could not receive the treatment outside of work hours (Tr. 28).

D.E. 13 at 6.

Indeed, this case is not on the same level as *Cook*. The ALJ here clearly considered Rutherford's need for weekly infusion treatments. But the ALJ assumed (in the absence of contrary evidence) the infusions could be done after the work week. And the ALJ disregarded (as unsupported by the record) Rutherford's claim that the infusions left her so nauseated and fatigued she could not work for the following two days.

The Court has found other relevant cases besides *Cook*. Like *Cook*, none of them are binding on this Court, but each is instructive. To provide one example, the ALJ's non-disabled finding was affirmed in *Bray*. There, the claimant needed to see her counselor at least twice a

---

[8] This appears to be a standard opinion among vocational experts. For example, in *Bray*, the vocational expert "testified that Plaintiff could miss two full days of work per month." *Bray v. Comm'r of Soc*. Sec., No. 1:13-CV-40, 2013 WL 5979987, at *7 (S.D. Ohio Nov. 12, 2013), *report and recommendation adopted*, 2014 WL 4377771 (S.D. Ohio Sept. 3, 2014). The vocational expert in *Payne-Hoppe* testified an employer would tolerate "no more than a day to a day and a half of unscheduled absence" per month. *Payne-Hoppe v. Comm'r of Soc. Sec.*, No. 1:11-CV-0097, 2012 WL 395472, at *17 (S.D. Ohio Feb. 7, 2012), *report and recommendation adopted*, 2012 WL 709274 (S.D. Ohio Mar. 5, 2012)
  Here, the vocational expert was given a hypothetical in which a person took unscheduled breaks that amounted to 15% of the work day. The vocational expert said that "would be considered excessive off task behavior and . . . employment could not be maintained." This "would be the same for all jobs." D.E. 5-2 at 81-82.

month, and the vocational expert testified that two absences per month would preclude full-time work. However, the reviewing Court upheld the ALJ's denial of benefits when the claimant "presented no evidence whatsoever that her therapy sessions could not have been scheduled prior to work, after work, on a non-work day, or even over a lunch hour." *Bray v. Comm'r of Soc. Sec.*, No. 1:13-CV-40, 2013 WL 5979987, at *7 (S.D. Ohio Nov. 12, 2013). This case is similar in that the ALJ found "no evidence why the claimant could not receive these treatments outside of work hours." D.E. 5-2 at 28.

Another case with an affirmance is *Pryor*. The claimant there testified he attended two three-hour physical therapy sessions a week. *Pryor v. Comm'r of Soc. Sec.*, No. 14-13325, 2015 WL 12683977, at *5 (E.D. Mich. Aug. 21, 2015), *report and recommendation adopted*, 2015 WL 6735336 (E.D. Mich. Nov. 4, 2015). The court recognized that "physical therapy appointments could conceivably conflict with one's work in a manner that would render competitive employment impossible." *Id.* at *7. However, the claimant

> failed to set forth any facts or medical opinions which demonstrate that he requires physical therapy on a rigid schedule that would conflict with his ability to work. Pryor has not established any reason to think that he is unable to attend physical therapy sessions after work, on the weekends, during lunch, or on some other schedule. The claimant is tasked with providing evidence in support of his alleged disability. *See* 20 C.F.R. § 404.1512(a), (c); *Her v. Apfel*, 203 F.3d 388, 391 (6th Cir. 1999). The Court cannot, on the scant evidence presented, simply assume that Pryor's access to therapy is so limited that he could not attend to both a competitive work schedule and his therapy sessions. *See Brown v. Astrue*, No. 08-4026-CV-C-NKL-SSA, 2008 WL 4151613, at *2 (W.D. Mo. Sept. 2, 2008) (affirming an ALJ's decision where "nothing in the record indicated . . . [the claimant] could not arrange her medical appointments around a work schedule"); *see also Barnett v. Apfel*, 231 F.3d 687, 691 (10th Cir. 2000) (holding that courts need not assume that a doctor's appointment would consume an entire day); *Rood v. Colvin*, No. 12-2595-SAC, 2014 WL 172131, at *4 (D. Kan. Jan. 15, 2014) (affirming the Commissioner where a doctor recommended continued psychiatric therapy, but the ALJ declined to include that limitation in the RFC, because there was no indication that the therapy sessions must "occur during the workday or with such frequency as to constitute a work-related limitation.").

14

*Id.*

On the other hand, the case of *Payne-Hoppe* resulted in remand. That claimant testified she received infusions at a clinic every other week that required her to spend several hours there. After the hearing, Payne-Hoppe submitted a report from the infusion provider that confirmed her testimony that she had to spend several hours at the clinic each time. The court found the ALJ erred in discounting the impact of this report, *i.e.*, confirmation that the excessive absences caused by the injection appointments would preclude full-time work. *Payne-Hoppe v. Comm'r of Soc. Sec.*, No. 1:11-CV-97, 2012 WL 395472, at *16-17 (S.D. Ohio Feb. 7, 2012), *report and recommendation adopted*, 2012 WL 709274 (S.D. Ohio Mar. 5, 2012).

If it is true that Rutherford could not have scheduled her in-home treatments after the end of the work week, she could have, like Payne-Hoppe, submitted evidence to that effect after the hearing. Rutherford's ALJ did, after all, specifically ask Rutherford whether this could be done. D.E. 5-2 at 56-57. Due to this lacuna in the record, the case for remand here is weaker than in *Payne-Hoppe*.

The *Miller* case also resulted in a remand. The claimant there had weekly "N-plate injections" that took two hours to perform. The injections were done at a doctor's office. *Miller v. Astrue*, No. 1:12-CV-16, 2012 WL 6644390, at *5 (S.D. Ohio Dec. 20, 2012), *report and recommendation adopted*, 2013 WL 360375 (S.D. Ohio Jan. 30, 2013). The court found a lack of evidence as to whether these treatments "could be scheduled in such a way to avoid excessive absenteeism," in other words, whether they could be done "during non-work hours." *Miller*, 2013 WL 360375, at *1. The court concluded: "While the ALJ rejected as 'speculative' Plaintiff's contention that she could not schedule her N-plate injections at a time that would not interfere with full-time employment, it is logical to presume that she would only be able to

obtain this treatment during normal working hours." *Id*. at *2. The *Miller* court's presumption here conflicts with other cases that require the claimant to prove that appointments can not be scheduled in a manner to allow full-time employment.

For a final example, the court in *Hodson* consulted *Pryor*, *Bray*, *Miller*, and *Payne-Hoppe*, and ultimately upheld the ALJ's decision not to include medical-appointment absences in the RFC. *Hodson v. Comm'r of Soc. Sec.*, No. 3:17-CV-96-GNS-CHL, 2018 WL 3326842, at *5-6 (W.D. Ky. Mar. 1, 2018), *report and recommendation adopted sub nom. Hodson v. Berryhill*, 2018 WL 1558106 (W.D. Ky. Mar. 30, 2018). Hodson testified that she had three to four doctor's appointments a week and provided her own calendar entries in support. However, she provided no "medical evidence or testimony from medical sources with respect to the appointments that she requires (and the duration and frequency of same) due to those impairments." *Id*. at *5. In contrast, Rutherford's records thoroughly document her infusion treatments every Friday at noon. D.E. 5-10. So, the case is quite distinguishable on this basis.

However, the *Hodson* court's next analytical step is critical. Following *Pryor* and *Bray*, the *Hodson* court roundly assigned the burden of proof on this issue to the claimant:

> the courts in *Pryor* and *Bray* indicated that a claimant bears the burden of showing that his or her appointments necessarily conflict with a work schedule and cannot be scheduled prior to work, after work, or on a non-work day. Plaintiff has not done this. . . . As the Commissioner notes, SSR 96-8p, 1996 WL 374194 states that the RFC is an individual's maximum remaining ability to do sustained work activities for eight hours a day, for five days a week, *or an equivalent work schedule.* Plaintiff bears the burden of proof with respect to her RFC to perform sustained work activities on a regular and continuing basis, including the effects of treatment on same, *e.g.*, their frequency and duration. *Id.* at *5 ("The RFC assessment must be based on all of the relevant evidence in the case record, such as . . . [t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication). . . .").

16

*Hodson*, 2018 WL 3326842, at *5.  Indeed, case law in this Circuit is clear that the claimant bears the burden on Step 4 issues, including RFC.  *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 855 (6th Cir. 2010); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  And, as *Hodson* notes, this includes work capacity limitations caused by medical appointments.  *Miller*'s contrary presumption that medical appointments must be done during normal work hours is an outlier.

This is a close case that an ALJ could have decided differently.  But the question before this Court is whether the ALJ's RFC and credibility determination were supported by substantial evidence.  There is no dispute that Rutherford needs weekly infusion treatments.  The record demonstrates she normally receives them every Friday.  But the record is silent as to whether those infusion treatments could be scheduled after the work week.  The medical records agree with Rutherford's testimony that she takes Zofran for nausea.  But the medical records do not establish Rutherford's nausea was a consequence of her infusion treatments or that the nausea persists after her Zofran prescription.  Some of the medical records indicate a *lack* of nausea and *lack* of adverse effects or complications from the Prolastin infusions.  Further, this case is closer to *Bray* and *Pryor* than to *Cook*.  And Rutherford did not seize the opportunity to supplement the record after the hearing like in *Payne-Hoppe*.  Given this Court's circumscribed scope of review and Rutherford's burden of proof, the ALJ's RFC determination must stand.  As for the discreet issue raised in this appeal, the ALJ's decision was sufficiently supported by the record to survive substantial-evidence review.

In her reply, Rutherford characterizes the ALJ's alleged error as a legal error rather than a substantial-evidence issue.  D.E. 14.  Rutherford argues the ALJ failed to point to actual inconsistencies between her testimony and the medical records.  *Id*. at 3-5.  To the contrary, the

17

ALJ pointed to records stating that Rutherford suffered no adverse effects from her infusion treatments, records in which she denied nausea, and records stating she suffered nausea *without* the infusion treatments. D.E. 5-2 at 28. There is indeed a tension between certain of the medical records and Rutherford's testimony on the infusions' effects. The issue here is thus not properly characterized as legal error. If there were medical records that substantiated Rutherford's testimony that the infusions leave her too nauseous to work, then Rutherford should have brought those records to the court's attention.

## IV. CONCLUSION

The Court being sufficiently advised, **IT IS HEREBY ORDERED** as follows:

(1)   Plaintiff's request to remand (D.E. 9) is **DENIED**.

(2)   **JUDGMENT** will be entered in favor of the Commissioner by separate contemporaneous order.

This the 20th day of May, 2024.

Signed By:
*Hanly A. Ingram*
United States Magistrate Judge